**AFFIRMED; Opinion Filed June 9, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-01201-CR

### DAVID DEWAYNE OWENS, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court No. 1
Dallas County, Texas
Trial Court Cause No. F12-51368-H**

## OPINION

Before Justices Lang-Miers, Myers, and Lewis
Opinion by Justice Myers

Appellant David Dewayne Owens was convicted by a jury of murder. The trial court found the two enhancement paragraphs alleging prior felony convictions true and sentenced appellant to life imprisonment. In three issues, he argues the evidence is insufficient to support the conviction, the trial court erred by denying his motion for mistrial, and the trial court erred by admitting hearsay statements. We affirm the trial court's judgment.

### BACKGROUND AND PROCEDURAL HISTORY

Dallas Police detective Seth Rosenberg testified that on June 4, 2011, he was directed to a crime scene—an apartment on Nomas street in Dallas, Texas. When he arrived at the crime scene at around 7:30 p.m., the front door to the apartment was open. He looked inside and found "piles of clothes all over the place" and a woman on the bed. She was not moving. At that point, Rosenberg and the other officers believed the woman had died from natural causes because there

were no signs she had been murdered or harmed, and there was some jewelry and other items on the nearby "tables and stuff" that was not taken. He testified that the apartment was so dusty and dirty the officers "couldn't fingerprint anything." Used syringes and other drug paraphernalia were found in the apartment, which Rosenberg testified looked like a drug user's house.

Teresa Marsh testified that she knew the deceased, Dorsey Beatrice Jackson, or Dorthy B, who was seventy-two years old at the time of her death, because they would smoke crack and inject heroin together. Marsh admitted to having a criminal record, including five prior felony prostitution convictions, misdemeanor prostitution convictions, and four prior convictions for delivery of a controlled substance. At the time she testified, Marsh was incarcerated for delivery of a controlled substance. Marsh testified that she had known Jackson for approximately ten years. Marsh used to stay at Jackson's apartment to get "high" and change clothes. At other times, she stayed in an empty apartment at the apartment complex because the deceased would not allow prostitutes in her apartment while she was away. Marsh testified that Jackson's behavior was unpredictable. She could be "real mean" and sometimes pulled knives on people, but at other times was pleasant. Marsh testified Jackson "[p]retty much" displayed the behavior of a typical drug addict.

Marsh spent the night of Friday, June 3, 2011, in an empty apartment at the complex. On the following morning, Saturday, June 4, Marsh woke up "because we had to get out of the apartment before the manager came." She admitted that she got high on heroin before leaving. At around one o'clock in the afternoon, Marsh and two other people were walking behind Jackson's apartment and noticed the rear door was open. Inside the apartment they found Jackson's naked body lying on the bed, with one eye open. The apartment had been "trashed real bad," and appeared to have been ransacked. Marsh told a neighbor to call the police.

At trial, Marsh looked at the crime scene photos and testified that Jackson was covered

with a blanket she did not normally use. She testified that the blanket seen in the photographs was normally kept in a closet, and that the apartment did not normally appear the way it looked in the photographs. Marsh also recalled that Jackson had a "brand new" air conditioner in her apartment. It was not there on the day they found her body, but the apartment was still a "little bit" cool inside, suggesting the air conditioner had been running recently. Marsh had last seen Jackson alive the previous Wednesday. She testified that she knew appellant and had seen him at Jackson's apartment "a few times" in the approximately seven years she had been staying at the apartment complex on Nomas street.

Lakeisha Thomas testified that she first met appellant sometime around 2003 or 2004, through a mutual friend. They had a brief relationship at that time, but it ended when Thomas got back together with her husband. Appellant and Thomas rekindled their relationship in about 2011, by which time Thomas had been separated from her husband (they subsequently divorced). In 2012, she was with appellant when he went to speak with Dallas Police Department detectives regarding the instant case. She met Detective Brent Maudlin, who gave her a business card. About one week later, she drove appellant to a second interview with the detective. While they were driving to the interview, appellant changed his mind and decided he did not want to go. Thomas started asking appellant questions as to why he did not want to go to the interview. She did not know why the police wanted to talk to him. Appellant told her not to worry about it but Thomas persisted, pointing out that Maudlin was expecting them. Thomas recalled that she was asking appellant "why all of a sudden we're not going to talk to the Detective for the interview." As the conversation escalated and appellant grew angrier, he told her that "he did it, that's why."

Thomas pressed appellant for details, thinking he had gotten "into a fight with his friends or something or maybe it was guns involved or something." He told Thomas "he had strangled or it was strangling or strangulation." She asked him what he was talking about, and appellant

told her "it had to do with a murder." He also told her that, on the day of the murder, a lot of people were "hanging out and doing whatever" at this person's house, and that he went back to the house later that night. The incident occurred when appellant went back to the residence. Appellant did not provide many other details about what happened. He did, however, demonstrate with his hands how he strangled the person "[u]ntil she stopped breathing," which was the only indication Thomas had that the victim was female. Appellant told her one of his thumbs was "dislocated or hurt or injured because of the amount of pressure" he applied during the strangulation. But appellant never told Thomas where or when he strangled the woman, who she was, or why he did it; nor did she see anything about it in the news.

Thomas told appellant he needed to talk to the detective. Appellant replied that "[d]ead people can't talk, so that's why a lot of crimes go on and things happen because if they're not alive to talk to people, you will never know anyway." He said he wanted to get out of the car to use the restroom, so she stopped at a Wendy's restaurant. She stayed in the car while appellant went inside then called Maudlin, telling him appellant had just "confessed to me what he had to say about the murder." Maudlin told her to calm down and to take appellant wherever he wanted to go, after which she could talk to him. When Thomas ended the call to Maudlin, she called her mother to let her know she was scared and did not know what to do. She was still on the phone with her mother when appellant returned, and she continued talking to her mother as appellant got in the car. She wanted her mother to know where she was in case anything happened to her.

Thomas dropped appellant off on Nomas street. She did not recall the physical address where she dropped appellant off, but she remembered that she had driven appellant to that area "[t]oo many to count, sir." After dropping appellant off, Thomas spoke to Maudlin, providing a video interview and a written statement. On cross-examination, Thomas admitted that she had continued to communicate with appellant by phone and letter after he was incarcerated.

–4–

Dr. Jeffrey Barnard, the Dallas County Chief Medical Examiner and the director of the Southwestern Institute of Forensic Sciences (SWIFS), performed the autopsy on the victim. He testified that she was seventy-two years old, four feet and eight inches tall, and weighed eighty-six pounds. Dr. Barnard observed petechiae (punctuate hemorrhages) of the eyelids, which can be caused by a constriction of the neck where the return of blood is obstructed. He noted a recent abrasion on the deceased's chin. During the internal examination, Dr. Barnard found a contusion or bruise on the front part of the right shoulder where the arm and chest come together. The bruise was not visible on the skin surface but could be seen in the musculature once an incision was made. He also noticed recent bruising to the soft tissue under the scalp on the left frontal bone and the left side of the head—an injury that was caused by blunt-force trauma where something struck the side of the deceased's head or her "head in motion" struck something else. Dr. Barnard found several areas of bruising inside the deceased's neck. He testified: "[I]t's a blunt-force injury and it's frequently seen in strangulations." In Dr. Barnard's opinion, Jackson died as a result of strangulation. He concluded the trauma was secondary to strangulation as a cause of death. The toxicology results showed the victim had drugs in her system; she tested positive for cocaine, morphine, and diphenhydramine, or Benadryl.

Detective Brent Maudlin of the Dallas Police Department testified that he started to suspect Jackson's death was a homicide after he received a telephone call from the medical examiner's office concerning the autopsy results. After appellant became a person of interest in the case, Maudlin interviewed appellant on or about January 12, 2012. During the interview, Maudlin asked for and received appellant's consent to swab the inside of his mouth for a DNA sample. The buccal swab taken from appellant was sent to SWIFS for testing. Maudlin testified that he received a telephone call from Lakeisha Thomas approximately one week later. Asked about Thomas's demeanor over the telephone and her tone of voice, Maudlin recalled that

Thomas "seemed concerned for her safety" and "[s]he seemed to be very excited and nervous and in a hurry to finish the conversation outside the presence of the Defendant." Later that day, after she met Maudlin at his office and provided a written statement, Maudlin obtained a warrant for appellant's arrest.

The State also presented DNA evidence and testimony. Amanda Webb, a forensic biologist at SWIFS, testified that vaginal, oral, and anal swabs taken from the victim were tested for the presence of seminal fluid. Webb did not find any evidence of seminal fluid or sperm cells on the swabs. She also testified that fingernail clippings from each of the victim's hands were swabbed for DNA testing. Courtney Ferreira, a forensic biologist at SWIFS, conducted the DNA analysis on a buccal swab from appellant, an autopsy blood sample from the victim, and the victim's fingernail clippings. Ferreira obtained "mixed" DNA profiles from both sets of fingernail clippings, meaning there was more than one DNA contributor. The DNA profile from the right-hand clippings showed that the victim was one of the contributors to the DNA found on the clippings. The second contributor was a single adult male that matched the DNA profile of appellant, David Owens, based on the buccal swab obtained from appellant. Ferreira added that "[a]ll of the genetic markers that were detected in that mixture were either accounted for . . . by [the victim] or matching the DNA profile of [appellant]." According to Ferreira, the probability of appellant's DNA profile matching someone else's DNA profile was 1 in 292 trillion. The DNA profile obtained from the left-hand fingernail clippings showed that the major contributor was a single female that matched the victim's profile, and the minor contributor corresponded to the genetic markers from appellant's DNA profile. Ferreira testified that the DNA found under the fingernails is usually epithelial cells (skin cells) or body fluid cells. She added that it was unlikely a person would get a DNA profile of someone else from touching them because there has to be some stronger, "more significant contact," and that scratching someone could

potentially leave a DNA profile under the fingernails. On cross-examination, Ferreira testified that she did not use separate swabs for each of the victim's fingernails, and she did not know if the DNA was found under all of the victim's fingernails or more than one fingernail of each hand. She also testified that finding appellant's DNA under the victim's fingernails merely showed there was some sort of physical contact between them.

After Ferreira testified, the State rested its case. The defense rested without calling any witnesses. The jury ultimately found appellant guilty of murder as charged in the indictment. Following a sentencing hearing held before the trial court, the trial court found as true both of the indictment's enhancement paragraphs alleging prior felony convictions for failure to comply with sex offender registration requirements and aggravated sexual assault, and sentenced appellant to life imprisonment.

## DISCUSSION

### *Sufficiency of the Evidence*

In his first issue, appellant contends the evidence is insufficient to support the conviction. In reviewing a challenge to the sufficiency of the evidence, we examine all of the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Lucio v. State*, 351 S.W.3d 878, 894–95 (Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.). We must defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Jackson*, 443 U.S. at 326; *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008).

The indictment charged that on or about June 4, 2011, appellant did:

unlawfully then and there intentionally and knowingly cause the death of DORSEY BEATRICE JACKSON, an individual, hereinafter called deceased, by

STRANGLING THE DECEASED WITH DEFENDANT'S HANDS, a deadly weapon,

And further did unlawfully then and there intend to cause serious bodily injury to DORSEY BEATRICE JACKSON and did then and there commit an act clearly dangerous to human life, to-wit: by STRANGLING THE DECEASED WITH DEFENDANT'S HANDS, a deadly weapon, and did thereby cause the death of DORSEY BEATRICE JACKSON, an individual[.]

The evidence shows that the victim died from strangulation. Her apartment appeared to have been ransacked and a new air conditioner that had been seen there recently was missing. DNA recovered from the victim's fingernail clippings matched only her DNA profile and appellant's DNA profile. Testimony also showed that DNA profiles are not normally obtained from merely touching someone and that some sort of physical contact, such as scratching, is usually required. There was recent bruising in the victim's neck that was consistent with blunt-force injury. Dr. Barnard testified that blunt-force injury is "frequently seen in strangulations." Appellant and the victim knew one another, and appellant had been seen at her apartment on a number of occasions. In addition, appellant told Thomas he spent time "hanging out" at a residence one day, then returned to the residence that night and strangled a woman. Appellant demonstrated to Thomas with his hands how he strangled the woman, then told her his thumbs were injured because of the amount of pressure he applied during the strangulation. Dr. Barnard testified regarding the amount of pressure it takes to strangle someone—about four pounds of pressure to obstruct the jugular veins and about eleven to twelve pounds of pressure to compress and shut off the carotid arteries. The jury could have reasonably concluded that this accounted for the injuries to appellant's thumbs described by Thomas.

Viewing the evidence in the light most favorable to the verdict, we conclude a rational trier of fact could have found beyond a reasonable doubt that appellant committed the offense as charged in the indictment. Thus, the evidence is sufficient to support appellant's conviction for murder. We overrule appellant's first issue.

*Motion for Mistrial*

In his second issue, appellant argues the trial court abused its discretion by denying the defense's motion for mistrial "based on prejudicial testimony concerning appellant's drug use."

We review a trial court's ruling on a motion for mistrial for an abuse of discretion. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004); *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). An appellate court must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Wead*, 129 S.W.3d at 129. A mistrial is required only in extreme circumstances where the prejudice is incurable. *Archie*, 221 S.W.3d at 699. A mistrial is the trial court's remedy for improper conduct that is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Hawkins*, 135 S.W .3d at 77.

Testimony referring to or implying extraneous offenses can be rendered harmless by an instruction to disregard unless they are so clearly calculated to inflame the minds of the jury and are of such a nature as to suggest the impossibility of withdrawing the impression produced. *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992). Whether a witness's improper reference to an extraneous offense warrants a mistrial depends on the particular facts of the case. *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). "In most instances, an instruction to disregard the remarks will cure the error." *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). Because a mistrial is an extreme remedy, a trial court should declare a mistrial only when the error or misconduct is highly prejudicial and incurable. *See Hawkins*, 135 S.W.3d at 77; *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003); *Hudson v. State*, 179 S.W.3d 731, 738 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

The record shows that Teresa Marsh, the second witness called by the State, admitted that she had been in trouble with the law—some theft convictions but mostly prostitution and drug-related offenses. At the time she testified, she was incarcerated for a drug-related offense.

She testified that she and the victim would get "high" together, smoking crack and injecting heroin. The prosecutor then asked Marsh how she knew appellant. The relevant portion of the record reads as follows:

Q. [THE PROSECUTOR]: Okay. Now, I—I only want to talk [sic] you about how you've known [appellant], you know, in the—in the past year. Have—have you known [appellant] in the past year?

A. Yes, sir.

Q. Okay. And—how would you know him?

A. Like, he was cool with me. Like, we used to get high together.

[DEFENSE COUNSEL]: Your Honor, we would object to extraneous offenses.

THE COURT: At this point, sustained.

[DEFENSE COUNSEL]: We'd ask that the jury be instructed to disregard.

THE COURT: The jury will disregard the last answer.

[DEFENSE COUNSEL]: We further move for mistrial.

THE COURT: Denied.

On cross-examination, Marsh admitted she had been convicted of felony prostitution at least five times and had misdemeanor prostitution convictions, and that she had at least four felony convictions for delivery of a controlled substance.

Appellant argues that asking the jury to disregard Marsh's testimony was insufficient given the evidence elicited and the nature of the offense. However, Marsh's testimony was not clearly calculated to inflame the juror's minds nor was it of such a character as to suggest the impossibility of withdrawing the impression left on the jury. The trial court's prompt and unequivocal instruction to disregard was sufficient to cure any harm resulting from the impression left on the jury. We presume the jury followed the trial court's instruction. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) (noting that a reviewing court generally considers instructions given to the jury sufficient to remedy most improprieties that

–10–

occur during trial and presumes the jury will follow the trial court's instructions).  We therefore conclude the trial court did not abuse its discretion by denying appellant's motion for mistrial.  Appellant's second issue is overruled.

*Hearsay Statements*

In his third issue, appellant contends the trial court erred by admitting hearsay testimony from Detective Maudlin concerning what Lakeisha Thomas told him during the telephone call he received from her.  The relevant portion of the record reads as follows:

Q.  [PROSECUTOR:] Well, let me start with this:  Can—can you describe how Ms. Thomas was behaving over the phone when you first spoke with her?

A.  She seemed concerned for her safety.

Q.  Okay.  How was she speaking?

A.  She seem [sic] to be very excited and nervous and in a hurry to finish the conversation outside the presence of the Defendant.

Q.  Okay.  Do you recall—did she tell you where she was at the time this phone call took place?

A.  There was—

[DEFENSE COUNSEL]:  Once again, we would object to hearsay.

[PROSECUTOR]:  Excited utterance, Your Honor?

THE COURT:  All right.  Rephrase your question.  Go ahead.

Q.  [PROSECUTOR:] Okay.  You had just testified that she seemed excited and nervous at the time she called you?

A.  Yes, sir, that's correct.

Q.  Okay.  Did she—did she give you any indication that she was still with the Defendant?

A.  Yes, sir.  She—

[DEFENSE COUNSEL]:  Once again, we would object to hearsay.

THE COURT:  Overruled.

THE WITNESS:  Yes, sir, she did.

Q. [PROSECUTOR:] And was she speaking slowly or fast?

A. Seemed to me, rather quickly.

Q. Okay. Now, I don't want to get into everything she said, but suffice to say at the end of your conversation, you felt it was necessary to talk with her further?

A. Yes, sir, that is correct.

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *See Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007). A trial court abuses its discretion when it acts outside the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim. App. 1991) (op. on reh'g).

Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). For hearsay to be admissible it must fit into an exception provided by a statute or the rules of evidence. One such exception is for excited utterances. *See* TEX. R. EVID. 803(2); *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). An excited utterance is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." TEX. R. EVID. 803(2); *see Salazar v. State*, 38 S.W.3d 141, 154 (Tex. Crim. App. 2001). The basis for the excited utterance exception is a psychological one, namely that when a person is in the instant grip of violent emotion, excitement or pain, she "ordinarily loses the capacity for reflection necessary to the fabrication of a falsehood and the 'truth will come out.'" *Zuliani*, 97 S.W.3d at 595.

In determining whether a hearsay statement is admissible as an excited utterance, the critical determination is "whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event" or condition at the time of the statement. *McFarland v. State*, 845 S.W.2d 824, 846 (Tex. Crim. App. 1992). The trial court may consider the time elapsed and whether the statement was in response to a question. *Zuliani*, 97 S.W.3d at 595. However, it is

not dispositive that the statement is an answer to a question or was separated by a period of time from the startling event; these are simply factors to consider in determining whether the statement is admissible under the excited utterance hearsay exception. *See Lawton v. State*, 913 S.W.2d 542, 553 (Tex. Crim. App. 1995), *overruled on other grounds*, *Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998). As the reviewing court, we must determine whether the statement was made "under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." *Zuliani*, 97 S.W.3d at 596 (citing *Fowler v. State*, 379 S.W.2d 345, 347 (Tex. Crim. App. 1964)).

The portion of the record quoted above shows that appellant made two hearsay objections to Maudlin's testimony concerning the telephone call. The first objection was to the prosecutor's question regarding whether Thomas told Maudlin where she was at the time the phone call took place. The prosecutor argued the excited utterance exception to the hearsay rule. The trial court told the prosecutor to rephrase the question, after which the prosecutor pursued a different line of questioning. Because the witness never answered the question posed, there is nothing for us to consider.

The second hearsay objection was made after the prosecutor asked Maudlin if Thomas gave him any indication she was still with appellant. When Maudlin answered yes, the defense again objected to hearsay. Prior to the objection, Maudlin had testified that Thomas seemed concerned for her safety when she called him, that she seemed very excited and nervous, and that she was in a hurry to finish the conversation outside appellant's presence. Appellant argues that the State failed to show that Thomas's statement was the product of a startling event, and that no questions were asked concerning why she was nervous or what happened to make her excited and nervous. But this argument overlooks Thomas's earlier testimony in which she described in detail how, prior to calling Maudlin, she heard appellant say that he had strangled a woman, after

–13–

which he demonstrated with his hands how he strangled her. The record in this case reasonably shows Thomas was still dominated by the emotions, fear, and excitement of the event when she spoke to Maudlin. Because the record supports the trial court's ruling, we cannot say the trial court abused its discretion by overruling appellant's objection.

Furthermore, even if were to conclude the trial court erred by overruling appellant's hearsay objection, the error, if any, was harmless. *See* TEX. R. APP. P. 44.2(b). The admission of inadmissible hearsay constitutes nonconstitutional error, and it will be considered harmless if we, after examining the record as a whole, are reasonably assured the error did not influence the jury verdict or had but a slight effect. *See id.*; *Garcia v. State*, 126 S.W.3d 921, 927–28 (Tex. Crim. App. 2004); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). Likewise, error in the admission or exclusion of evidence does not affect substantial rights and is harmless if the evidence is cumulative of other evidence admitted to prove the same fact. *Infante v. State*, 404 S.W.3d 656, 663 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *Eggert v. State*, 395 S.W.3d 240, 244 (Tex. App.—San Antonio 2012, no pet.). After examining the record, we are reasonably assured the admission of Maudlin's objected-to testimony did not influence the jury verdict, or had a slight effect. The jury had previously heard Thomas describe the telephone conversation she had with Maudlin following appellant's statement that he had strangled a woman. As a result, any error in this instance was harmless because the objected-to evidence was cumulative of other properly admitted evidence. We overrule appellant's third issue.

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
121201F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

## **JUDGMENT**

DAVID DEWAYNE OWENS, Appellant

No. 05-12-01201-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 1, Dallas County, Texas
Trial Court Cause No. F12-51368-H.
Opinion delivered by Justice Myers.
Justices Lang-Miers and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 9th day of June, 2014.

/Lana Myers/
LANA MYERS
JUSTICE

–15–